Sherman F. Little v. Commissioner. Juanita Little v. Commissioner.
Little v. Commissioner
Docket Nos. 10332, 10333.
United States Tax Court
1947 Tax Ct. Memo LEXIS 56; 6 T.C.M. (CCH) 1133; T.C.M. (RIA) 47291; October 22, 1947
*56 Held, on the facts that petitioners did not realize income in the taxable year in excess of the amounts reported on their tax returns. S. L. Mayo, Esq., 924 Kirby Bldg., Dallas 1, Tex., and J. Cleo Thompson, Esq., for the petitioners. Allen T. Akin, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion These proceedings were consolidated for hearing and disposition. In the 90-day letters mailed about nine months after the petitioners filed their returns and several weeks after the making of a jeopardy assessment, the respondent determined an income tax deficiency of $43,713.43 and a 50 per cent fraud penalty of $21,856.72 against each petitioner for the calendar year 1944. These deficiencies were determined on the basis of alleged unreported community income of about $135,000. The pleadings have several times been amended with the result that respondent has confessed error in his determination to the extent of about $95,000. On brief, he has reduced his claim for a deficiency against each petitioner to $10,530.80 with penalty of $5,265.40. While the deficiency notices listed numerous items of alleged unreported income, the respondent *57 in his amended pleadings has abandoned many of these items and has set up claims for deficiencies based upon an increase in the petitioners' net worth during the taxable year and the making of certain expenditures of a kind not tending to increase net worth. What we have to decide is whether the petitioners received any income in excess of that reported in their returns for the taxable year and, if so, in what amounts. There is also the question whether penalties should be imposed. Petitioners claim a small overpayment. Findings of Fact Petitioners Sherman F. Little and Juanita Little, husband and wife, are residents of Dallas, Texas. They filed their returns for the taxable year with the collector of internal revenue for the second district of Texas. Sherman F. Little will sometimes hereinafter be referred to as the petitioner. Petitioner was a gambler by profession. For several years prior to the taxable year he was engaged in partnership with others in the operation of a small, semi-private clubroom for gambling located in a hotel in Dallas. The membership of the gambling partnerships changed from time to time. In the taxable year 1944, a partnership, consisting of petitioner, *58 James Worsham, and Mervin Weil, operated the clubroom (Maurice Club) from January 1 to January 23. Petitioner and Worsham each had a 45 per cent interest and Weil 10 per cent. From January 24 until November 6 a second partnership, consisting of petitioner, Worsham, Weil, and Roy J. Metcalf, with respective interests of 40 per cent, 40 per cent, 15 per cent, and 5 per cent, operated the clubroom. After November 6, gambling activities in Dallas were closed by the authorities for the remainder of the year. In March 1945, Worsham, Weil and Metcalf resumed operation of the clubroom without the petitioner as a partner. In 1944, operations at the clubroom commenced on January 3 with a bank roll of $8,000 contributed by the partners. Half of this amount was in the possession of petitioner and half in the possession of Weil. The club was open from 10:30 or 11:00 a.m. until 3:00 a.m. or later the next morning. Because of the long hours the partners operated in shifts. Weil usually had the day shift and petitioner the night shift. Occasionally Worsham and Metcalf ran a shift and had a portion of the bank roll. The partners kept a cash book in which they recorded the portion of the bank roll *59 charged to each partner operating a shift. Players at the clubroom bought plastic chips from employees, and the purchase money was inserted in a slotted box attached to the dice table. The partner on duty cashed out the players at the end of the game from the portion of the bank roll in his possession. He kept tally sheets or blotter records of all sums paid in cashing out the players, in paying wages to the employees (from three to six in number), and for other operating expenses. At the end of his shift the partner would remove the money from the slotted box on the dice table, count it, add the sum to the amount charged to him in the cash book at the beginning of the shift, subtract the sum of moneys paid out during the shift, and enter in the cash book the resulting amount as the portion of the bank roll chargeable to him for the beginning of the next day. The partner on the evening shift followed the same procedure. The difference between the total bank roll for the day and that of the previous day, as shown by these daily entries in the cash book, represented the gain or loss for the day. An outside accountant was employed by the partnership to keep account books and to attend *60 to all necessary records and tax reports for the business. He called at the clubroom about once a week, and from the entries made in the cash book he computed the daily gains and losses and transferred them to a permanent ledger record. He also recorded in the ledger the wages paid to employees, and other operating expenses. The partners operating shifts usually kept only a thousand or two thousand dollars cash on hand. The remaining portion of the bank roll charged to them on the books was ordinarily kept in safety deposit boxes or put in cashiers' checks. It was a common practice of the partners to buy cashiers' checks, in denominations of from $500 to $2,000, payable in the names of one another, or of other persons well known to them. This they did for the purpose of greater security and protection from loss by robbery or the like. These checks were sometimes used to pay off winning players at the club. Also, if needed, the partner on duty could readily obtain cash on the checks either from the banks or, if after banking hours, from some other clubroom in the city. The partnership as such had no bank account. Petitioner attended to most of the banking of the business. Personal *61 checks of players taken in at the clubroom were deposited for collection and cleared through his individual bank account. Also, when the bank roll in his possession grew larger than he needed for daily operations, he would deposit the excess in his bank accounts or his safety deposit box. The cash book showed at all times the amount of money for which he was responsible to the partnership regardless of whether he had the cash in his pocket, in cashiers' checks, in his lock box, or in his bank accounts commingled with personal funds. January was a bad month for the club. The first partnership sustained a net loss of $4,330, of which petitioner's share was $1,948.50. By January 31st the bank roll had been wiped out, and one of the partners had lost a part of his personal funds advanced in the play. At that time, the partners contributed an additional $8,184 to make up the small deficit and to have a new bank roll on which to operate. Subsequently the luck improved, and by August 10 the bank roll had reached a figure of slightly more than $30,000. At that time, the partners divided and distributed proportionately the sum of $15,335, reducing the bank roll to that extent. The second *62 partnership, during the portion of the year it operated the club, realized net income of $25,652, of which petitioner's share was $10,260.80. At the time gambling activities were suspended by the authorities on November 6, 1944, the partnership bank roll amounted to $22,164, of which $15,319 was charged to petitioner and $6,845 to Weil. Weil's share in the total bank roll was $3,324.60. Within a week or 10 days thereafter, Weil kept his share and turned the remainder of $3,520.40 over to the petitioner. Petitioner paid Metcalf his 5 per cent share. Petitioner's and Worsham's shares were $8,865.60 each. At Worsham's request, petitioner retained possession of Worsham's share until after the end of the year and make payment to him in February or March 1945. During the taxable year petitioner had other gains and losses in outside gambling transactions in some dozen games he engaged in on his own account, not connected with the clubroom. He kept a record of all his gains and losses in such games, and in 1944 he sustained a net loss of $211 therein. Petitioner and his first wife, Mrs. Gertrude Little, were married in 1920 and lived together until 1930. At that time, they separated *63 and lived apart. The first Mrs. Little worked while they were living together and continued to work after their separation. During the 13 years of separation, petitioner from time to time attempted to persuade her to sue for divorce. Finally, in the latter part of 1943 she agreed. Petitioner undertook to conceal his assets to protect them from attachment in the contemplated divorce action. He purchased a residence property, taking title in the name of Mervin Weil. He also purchased a Ford automobile, taking title in the name of his fiancee, Juanita Alford. In November and December he reduced his bank account to a nominal sum, withdrew considerable sums from his safety deposit box, and began purchasing cashiers' checks in large denominations, payable to other persons known to him. Gertrude Little filed suit for divorce on December 2, 1943, upon petitioner's depositing in escrow with the attorneys a cashier's check for $1,000. Petitioner also agreed to pay both attorneys' fees and the expenses incident to the marriage of their daughter, Hope Little, and to convey to Gertrude title to city lots which they owned. At the close of 1943, petitioner had acquired and owned $21,000 in cashiers' *64 checks, in addition to the equity of about $4,400 in the home purchased in Weil's name, two automobiles at a cost of about $2,000, and certain other assets. The closing bank roll of the gambling partnership for 1943 was $17,960 of which $8,250 was charged to petitioner. Petitioner's interest in the bank roll at that time was $8,082. A divorce decree was granted to Mrs. Gertrude Little on January 15, 1944. Petitioner married Juanita, the present Mrs. Little, on January 22. After the divorce decree, petitioner began feeding his liquid funds and the proceeds of cashiers' checks back into his bank accounts and safety deposit box. In the taxable year petitioner had four bank accounts, three of which were opened during the year. In the course of the year he made deposits to these accounts, totalling approximately $91,000, of which $11,500 represented direct transfers between accounts. The sources of these deposits were the cashiers' checks owned by the petitioner at the end of 1943 or proceeds thereof, portions of the partnership bank roll charged to him on the cash book of the partnership from time to time, numerous checks taken in from losing players at the clubroom and collected through *65 petitioner's accounts, and petitioner's shares of the partnership distributions. The larger deposits, in amounts such as $4,000, $5,000 and $10,000, coincide with days of unusually heavy winnings by the partnership. Withdrawals from the accounts during the year totaled approximately $67,000, $11,500 of which represented direct transfers between accounts. The bulk of these withdrawals was for the purpose of replenishing partnership operating funds and bank roll, for having money on hand at the clubroom from time to time to cover heavy playing, and for distributions to the partners. Many of the large withdrawals correspond to loss periods at the club. In addition, petitioner purchased about $7,000 of government bonds and an automobile at a cost of $2,000 to replace one of the automobiles he sold at his cost of $900. The bond and automobile purchases represented merely a change in the form of petitioner's assets. Petitioner's bank balances at the end of 1944 totaled about $24,500. Worsham's $8,865.60 share of the partnership bank roll which petitioner held for Worsham until after the close of the year is reflected in petitioner's closing bank balances. Petitioner's net worth at the *66 end of 1943 was approximately $35,000. The increase in petitioner's net worth during the taxable year did not exceed $2,000. In 1944, petitioner's entire expenditures for personal and living expenses of a type not increasing net worth, including payments of Federal income tax, amounted to approximately $6,000. In their returns for the taxable year, the two petitioners showed a total community income of $8,312.30, consisting of the difference between their $10,260.80 share of the net income of the second gambling partnership and their $1,948.50 share of the net operating loss of the first gambling partnership as reported in the partnership returns. The share of each petitioner in the community net income was reported as $4,156.15. Petitioners took no deduction in their returns for the net loss of $211 sustained in outside gambling transactions. Except for this item, petitioners' 1944 returns reported all their net income for that year. Opinion ARUNDELL, Judge: It seems rather obvious in this case that the respondent took a shot in the dark in determining the original deficiencies involved in these proceedings. The deficiency notices asserted a total taxable community income as *67 follows: Your bank balances increased
$ 13,337.79
U.S. Bond purchased and held
6,501.32
Checks payable to the Oak Cliff Bank
& Trust Co. of Dallas, Texas
10,000.00
Checks payable to the Texas Bank &
Trust Co. of Dallas, Texas
1,500.00
Real estate purchased in 1944
15,000.00
Living expenses paid
10,000.00
Gambling income
85,000.00
Outstanding cashier's checks pur-
chased in 1944
2,000.00
Total community income, 1944
$143,339.11
In the several amended pleadings the respondent has conceded error in his determination with respect to the $15,000 real estate purchase item and the $85,000 gambling income item. The evidence shows that the checks of $10,000 payable to the Oak Cliff Bank & Trust Company and $1,500 payable to the Texas Bank & Trust Company were direct transfers from other accounts of the petitioner. The $10,000 living expense item was more or less arbitrary, and respondent does not now contend that petitioner's expenses were in that large an amount. While petitioner's bank balances actually increased by about $24,000 instead of the $13,000 item set out above, Worsham's share in the 1944 closing bank roll of the gambling partnership is reflected *68 in petitioner's closing bank balances. The respondent, on brief, contends that petitioner's net worth in the taxable year increased by about $41,000 and that his personal and living expenses amounted to about $6,500. In computing petitioner's closing net worth for 1943, however, the respondent takes no account of the $21,000 in cashiers' checks which petitioner owned at that time. Respondent also understates petitioner's closing partnership equity by about $4,500 and his automobile investments by $900 and takes no account of a debt of approximately $1,500 owing to petitioner. In computing petitioner's closing net worth for 1944, the respondent takes no account, among other things, of petitioner's approximately $9,000 liability to Worsham. The present difference between the parties rests largely in respondent's refusal to believe that petitioner had $21,000 in cashiers' checks at the end of 1943. Petitioner unequivocally testified as to his possession and ownership of checks in that amount and the manner of their acquisition. His testimony in respect thereto is corroborated by that of at least two or three other witnesses. His reason for converting his assets in bank accounts and *69 safety deposit boxes into these checks toward the end of 1943 is explained by the pendency or imminence of the divorce action against him and his plan to protect his assets from attachment in that proceeding. Furthermore, petitioner has put in evidence the actual cancelled checks of this group in an amount totaling $18,000, and he testified that after a diligent search over a long period of time he was unable to locate the two checks making up the other $3,000. After the divorce decree was granted in January 1944, petitioner began feeding his assets back into his bank accounts and safety deposit box because the danger of attachment had passed. Petitioner was able to trace some of these checks specifically into his accounts. We are convinced that petitioner, in the voluminous record and numerous exhibits, has endeavored to make as full a disclosure and explanation as possible under the circumstances. The difficulty of explaining bank deposits consisting of many items and totaling about $91,000 over the course of a full year is understandable. With respect to the larger items, petitioner has made a satisfactory specific explanation. In addition, he has made available the bank ledger *70 sheets showing his bank transactions, the deposit slips, the partnership books, and other records. A careful analysis and comparison of these several records shows a rather close correlation between deposits and withdrawals and the winnings and losses of the gambling partnerships, the distributions to partners, and the portions of bank roll charged to the petitioner from time to time on the partnership books. This is true with respect not only to the major items which petitioner was able to identify specifically but to others as well. The books and records of the partnerships operating the Maurice Club, we think, clearly reflect their entire income and loss during the taxable year. Indeed, we do not understand that respondent questions that they show the correct partnership income. The petitioner's loss from the first partnership and his income from the second partnership reported in his individual return correspond exactly with his shares as shown in the partnership returns and partnership books and records. Petitioner devoted almost his entire time to the operation of the Maurice Club. In the few outside games in which he engaged during the taxable year, he kept a complete record *71 of each gain and loss. The result was that during the whole year petitioner sustained a net loss of about $200 in outside games. We think that the record he kept of such outside play and the records of the partnership disclose petitioner's entire income during the taxable year. Difficult as it is to prove negatives, particularly in view of the several shifts in the respondent's pleadings, we think the petitioner has satisfactorily demonstrated that the increase in his net worth during the taxable year did not exceed $2,000 and that his entire personal and living expenses were only about $6,000. These two are approximately equal to the income reported in the petitioner's individual return. It follows that the respondent erred in determining the deficiencies and penalties. Since an overpayment is claimed, Decisions will be entered under Rule 50.